✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

MAY 0 9 2025

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Between at least in or about January 2019 and June 2022, the Defendant, **ANISSA MAROOF**, knowingly caused to be distributed and dispensed Alprazolam (a Schedule IV controlled substance), Amphetamine-dextroamphetamine (a Schedule II controlled substance), and Buprenorphine (a Schedule III controlled substance), and did so knowing that the distribution and dispending were outside the scope of professional practice and not for a legitimate medical purpose.

**MAROOF** graduated from Howard Medical School, did her general psychiatry residency fellowship at Howard University, and then did an addiction psychiatry fellowship at the University of Maryland. She was board certified in general psychiatry and addiction psychiatry.

**MAROOF** owned and operated her own medical practice in Bethesda, Maryland and had a Drug Enforcement Administration (DEA) registration number that authorized her to prescribe controlled substances.

Through her medical practice, **MAROOF** provided customers from West Virginia with prescriptions for controlled substances, including Alprazolam, Amphetamine-dextroamphetamine, and Buprenorphine. **MAROOF** provided prescriptions for these controlled substances even though she knew that providing them was outside the scope of professional practice and not for a legitimate medical purpose. **MAROOF** used her DEA registration number to write these prescriptions. **MAROOF**'s customers included P.T., L.W., A.R., D.M., T.H., J.F., and T.P. P.T. and L.W. were Federal Bureau of Investigation (FBI) undercover agents who posed as customers and recorded their visits with **MAROOF**. The remaining five listed customers resided in West Virginia.

**MAROOF** prescribed customers combinations of Alprazolam, Amphetamine-dextroamphetamine, and Buprenorphine without warning them about the risks of combining these medications. **MAROOF** prescribed customers Alprazolam without warning them about the risks of mixing Alprazolam with alcohol. **MAROOF** prescribed controlled substances to customers even after they indicated that they were selling their excess supply of controlled substances through illicit channels. **MAROOF** prescribed customers Buprenorphine even when the customers did not claim to be addicted to opiates or recovering from such an addiction. Customers provided **MAROOF** with the dosages that they wanted. **MAROOF** regularly prescribed customers controlled substances without providing them any therapeutic services. **MAROOF** failed to check readily accessible databases to ensure that her customers were not obtaining controlled substances

from other physicians. **MAROOF** rarely performed urinalysis on her customers, even though they were purportedly drug addicts.

On numerous occasions, **MAROOF** called in prescriptions to local pharmacies without seeing the customer, and then directed the customer to leave cash under her office door in exchange for writing the prescriptions. **MAROOF** often advised customers how to split their prescriptions to be filled at different pharmacies.

The following are examples where **MAROOF** unlawfully wrote controlled substances to customer P.T.

On June 9 2021, P.T. contacted **MAROOF** through texts and calls that the FBI recorded. P.T. texted **MAROOF** asking for an office visit. **MAROOF** responded that she was only accepting patients serious about their recovery. **MAROOF** further stated that any missed appointments or payments would result in discharge. **MAROOF** outlined initial and subsequent office visit pricing and asked if P.T. had a pharmacy that would work with P.T.

**MAROOF** then asked if P.T. had previously used buprenorphine. P.T. confirmed previous use. **MAROOF** inquired about the duration and dose taken by P.T. in the past, of which P.T. was uncertain. P.T. advised that he took whatever he could get from other people. **MAROOF** then asked if two or three doses per day would be enough. In response, P.T. requested as much as possible. **MAROOF** advised that the most she could issue was three doses per day. **MAROOF** also instructed P.T. not to "use" while taking Subutex.

During the call, **MAROOF** also requested basic biographical information about P.T. and asked P.T. what, other than Subutex, he was taking. P.T. advised that he smoked marijuana and had tried heroin once. P.T. also mentioned taking Adderall to stay awake after taking Subutex. P.T. requested Adderall to counter the depressive nature of Subutex. **MAROOF** agreed to prescribe P.T. 20mg doses of Adderall.

**MAROOF** further asked P.T. if he ever received professional treatment, to include seeing a psychiatrist. P.T. denied having done so, and P.T. said he did not need professional psychiatric treatment. At the conclusion of the call, even though **MAROOF** had never previously met with P.T. in person and had only spoken with P.T. by telephone on this occasion, **MAROOF** indicated that she would call in the two prescriptions, for buprenorphine and Adderall, to a specified pharmacy. **MAROOF** also scheduled a follow-up office visit with P.T. for early July 2021.

At the end of the call, **MAROOF** asked P.T. for a credit card for payment, but P.T. indicated he did not possess a credit card and would have to pay in cash. **MAROOF** advised that P.T. could drop the payment at her office the following day. P.T. paid **MAROOF** $400 cash the following day and then obtained 90 tablets of 8mg Buprenorphine (3 doses per day) and 60 tablets of 20mg Adderall (2 doses per day) from the pharmacy.

On July 8, 2021, P.T. went to **MAROOF**'s office for a scheduled followed-up appointment. P.T. told **MAROOF** that the prescribed substances were working, but that he had

run out of the buprenorphine a week early because he had to "pay some people back" for giving him some in the past. Despite P.T. telling **MAROOF** that he was diverting buprenorphine pills to other individuals, **MAROOF** continued to prescribe P.T. buprenorphine at the same rate at this visit. **MAROOF** did not admonish P.T. for diverting pills.

P.T. also complained of not being able to sleep "on demand," and P.T. told **MAROOF** that a coworker had given him a Xanax pill which "did the trick." Following this visit, **MAROOF** electronically sent prescriptions for buprenorphine, Adderall and 1mg Xanax to the pharmacy. P.T. paid **MAROOF** $250 in cash. P.T. responded to the pharmacy and obtained 90 tablets of 8mg buprenorphine, 30 tablets of 1mg Xanax and 60 tablets of 20mg Adderall.

On August 13, 2021, P.T. went to **MAROOF**'s office for another scheduled appointment. **MAROOF** asked P.T. how everything was going, and P.T. confirmed that the Adderall was working well, as it was keeping him awake. P.T. complained that the Xanax was a "little weak" and that he needed to take two pills so that it "worked better" in getting him to sleep. **MAROOF** offered to change the Xanax prescription to either increase the number of 1mg pills or increase the dosage from 1mg to 2mg, ultimately agreeing to increase the dosage. **MAROOF** electronically sent new prescriptions for buprenorphine, Adderall, and 2mg Xanax to the pharmacy. P.T. paid **MAROOF** $250 cash prior to leaving the office. UC-1 went to the pharmacy and obtained 90 tablets of 8mg buprenorphine, 30 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall.

**MAROOF** typically charged customers $400 for their first visit and $250 for any subsequent visits. Collectively, L.W., A.R., D.M., T.H., J.F., and T.P. visited **MAROOF** 123 times between 2019 and 2022. Assuming that each visit cost $250, **MAROOF** made $30,750 from writing these prescriptions, and those funds constitute proceeds from the illegal distribution.

[cont'd]

The amount of Alprazolam, Amphetamine-dextroamphetamine, and Buprenorphine involved in this offense that was knowingly caused to be distributed and dispensed and knowingly done so without a legitimate medical need and outside the usual course of professional practice and that was reasonably foreseeable to **MAROOF** was equivalent to 88 kilograms of Converted Drug Weight pursuant to the Drug Conversion Tables of U.S.S.G. § 2D1.1. As an addiction psychiatrist registered with the DEA, **MAROOF** used a special skill in a manner that significantly facilitated the commission of the offense.

SO STIPULATED:

_____
Christopher Sarma
Elizabeth Wright
Assistant United States Attorneys

_____
Anissa Maroof
Defendant

_____
Robert Feitel, Esq.
Counsel for Defendant